UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Docket No.: 1:23-cv-10026-FDS

ROBERT P. CONLON and BETSY CONLON,
as the Personal Representative of the ESTATE
OF MICHAEL CONLON,

      Plaintiffs,

      v.

NEWTON POLICE OFFICER FRANCIS
SCALTRETO, NEWTON POLICE OFFICER
RICHARD BENES, NEWTON POLICE
SERGEANT GLENN CHISHOLM, NEWTON
POLICE CAPTAIN DENNIS DOWLING,
NEWTON POLICE CAPTAIN CHRISTOPHER
MARZILLI, and THE CITY OF NEWTON,

      Defendants

## DEFENDANT CITY OF NEWTON'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)

## INTRODUCTION

      This case stems from an encounter between City of Newton police officers and Michael Conlon that ended tragically. Officers were forced to use deadly force when Conlon charged at an officer while wielding a knife. Conlon's parents, Robert and Betsy Conlon (Plaintiffs), have filed a lawsuit against the City of Newton and five police officers. Against the City, their Complaint contains the following counts: (4) 42 U.S.C. §1983 – Negligent Training and Supervision; (5) 42 U.S.C. §1983 – Unconstitutional Failure to Provide Mental Health Treatment in Violation of the Fourteenth Amendment's Right to Due Process; (6) Americans With

1

Disabilities Act (ADA) – Failure to Accommodate Michael's Disability Under the ADA; (7)

Americans With Disabilities Act (ADA) – Failure to Train; and (8) Rehabilitation Act.

But all of these counts fail to state claims against the City because the officers acted

reasonably under the circumstances and there have been no similar incidents to support

municipality liability. As a result, as addressed below, all claims against the City should be

dismissed.

## FACTUAL ALLEGATIONS IN THE COMPLAINT

On January 5, 2021, at approximately 1:43 p.m., NPD Officer Zachary Raymond was

dispatched to respond to a reported armed robbery at 16 Lincoln Street in Newton Highlands.

Complaint ¶ 43. Within approximately one minute, Officer Raymond arrived at Indulge!, a candy

store located at that address. Complaint ¶ 44. On arrival, Officer Raymond observed Conlon

standing outside the store and holding a steak knife. Complaint ¶ 45.

Officer Raymond drew his service weapon and ordered Conlon to drop the knife.

Complaint ¶ 45. But Conlon refused and instead fled into his apartment building at 18 Lincoln

Street. Complaint ¶ 46. Conlon climbed the first two flights of stairs, stopping at the third and

top floor, with Officer Raymond in pursuit. Complaint § 47. While Officer Raymond continued

to approach Conlon and order him to drop the knife, Conlon turned around and placed the knife

to his own throat. Conlon stated that if Officer Raymond came any closer, he would cut his own

throat. Complaint ¶ 48. Conlon was waiving the knife around and used the handle to bang on the

door of Apartment 3, and repeatedly requested to speak with the resident, Danielle Kalfon, who

had opened the back door of the building to allow Newton Police officers entry so they could

confront Conlon. Complaint ¶¶ 7, 49.

When Conlon again held the knife to his throat, Officer Raymond retreated down the stairs to the second-floor landing. Complaint ¶ 50. Meanwhile, Captain Dowling and five other NPD Officers arrived. Complaint ¶ 51. Captain Dowling, the highest-ranking officer on scene, and Captain Marzulli determined that Conlon was experiencing a mental health issue. Complaint ¶¶ 52-53. Captain Dowling told other officers, "We have all the time in the world, we'll just wait it out. We'll wait him out." Complaint ¶ 54.

Officer Scaltreto was the primary officer speaking with Conlon. He was positioned on the third floor, in the hallway, approximately 12 feet from Conlon. Officer Benes and Sergeant Chisholm stood in the open doorway to Apartment 4, less than 20 feet from Conlon. Complaint ¶ 55. Also present were two Massachusetts State Police Officers standing inside Apartment 4 near the entry, less than 20 feet from Conlon. Complaint ¶ 55.

Conlon repeatedly stated that he believed he was in a simulation and questioned whether the officers present were real police officers. Complaint ¶ 56. Numerous officers, including the named Defendants, only offered to call Conlon's father in exchange for him dropping the knife. Complaint ¶57. Conlon was spitting and drooling as he spoke. Complaint ¶ 58. He did not make any verbal threats that he would hurt the officers or anyone else but himself. Complaint ¶ 59. Captain Dowling repeated that "time was on their side," and said for everyone to calm down. Complaint ¶¶ 63, 64. Captain Marzilli told the newly arriving officers that Conlon was a "psych patient" and that the situation was "a mental health issue." Complaint ¶ 65.

While Conlon spoke with the officers, Captain Dowling said that the plan was to wait for the NEMLEC tactical team[1] and negotiator to arrive before making any attempt to apprehend Conlon. Complaint ¶¶ 67, 68.

While Officer Scaltreto and others were speaking with Conlon, Captain Marzilli instructed Sergeant Chisholm to retrieve his less-than-lethal beanbag projectile shotgun. Complaint ¶¶ 70, 42. Captain Dowling instructed Captain Marzilli to wait for NEMLEC, but if necessary to shoot Conlon with the less-than-lethal beanbag shotgun while using the tasers of the two state troopers as backup. Complaint ¶ 73. Captain Dowling told Officer Benes that he was the "lethal option" if the non-lethal measures were ineffective, meaning that Officer Benes would need to shoot Conlon with his firearm. Complaint ¶ 74.

Officer Scaltreto was the lead officer negotiating with Conlon for his release of the knife. Complaint ¶ 77. When speaking with Officer Scaltreto, Conlon was holding the knife in one hand and a fire extinguisher in the other hand. Complaint ¶ 78. After approximately twenty minutes of speaking with Conlon, Officer Scaltreto convinced him to drop the knife and fire extinguisher to the floor. Complaint ¶¶ 80, 81.

Officer Scaltreto told the officers behind him that Conlon had dropped the knife and that there was "an opening." The knife lay on the floor beside him. Complaint ¶ 7. Hearing this, Captain Marzilli radioed to Captain Dowling that there was an "opening." Complaint ¶ 82. Captain Dowling ordered back to Captain Marzilli to have the less-than-lethal fired at Conlon. Complaint ¶¶ 87, 42.

---

[1] The Northeastern Massachusetts Law Enforcement Council (NEMLEC) is comprised of municipal police officers and employs a Regional Response Team (RRT) and Special Weapons and Tactics (SWAT) group specifically trained in de-escalation and negotiation techniques with mentally ill, suicidal or barricaded people. Complaint ¶¶ 6, 43.

Upon receiving Captain Dowling's order as relayed by Captain Marzilli, Sergeant Chisholm raised the less-than-lethal, pointed it at Conlon, and attempted to use it, but it did not fire. Complaint ¶¶ 90, 92. Sergeant Chisolm attempted to "clear" the less-than-lethal by discharging a round but was not able to fire the weapon due to operator error and inexperience. Complaint ¶ 92.

When the less-than-lethal did not fire, Conlon picked up the knife and ran at Sergeant Chisholm. Complaint ¶¶ 11, 93. As Conlon approached, Officers Scaltreto and Benes resorted to fatally shooting Conlon at close range. Complaint ¶¶ 11, 93-94, 96.

Regarding the City of Newton, the NPD issues General Orders to ensure that all Department personnel comply with established policies, procedures, and regulations. These policies include General Order 301 (Use of Force) which allows for officers to use the less-than-lethal beanbag projectile weapon to prevent suicide, among other situations. Complaint ¶ 42 (a)(i-viii). NPD policies also include General Order 601 (Special Operations) which establishes procedures for responding to high-risk emergencies, including suicide and emotionally disturbed/distraught barricaded persons. This involves coordinating with Northeastern Massachusetts Law Enforcement Council's (NEMLEC) Regional Response Team (RRT) and Special Weapons and Tactics (SWAT), who have trained negotiators. Complaint ¶ 42 (a-e). The NPD had no specific policy in effect, written or unwritten, relating to de-escalation techniques in response to a person's mental health crisis. Complaint ¶ 38. The NPD employed a full-time social worker, Sarah Eknian, to address mental health situations. She responded to the scene but was not permitted to intervene or speak with the officers who were confronting Conlon. Complaint ¶¶ 35, 148. By January 5, 2021, American law enforcement "widely accepted"

standard procedures concerning de-escalation including use of "tactical repositioning," which involves the concepts of time, distance, and barriers. Complaint ¶ 39(a-c).

## <u>MOTION TO DISMISS STANDARD</u>

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim that is plausible on its face. <u>Fraser v. Massachusetts Bay Transportation Auth.</u>, 544 F. Supp. 3d 148, 156 (D. Mass. 2021), citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). For a claim to be plausible, the "[f]actual allegations must be enough to raise a right to relief above the speculative level ...." <u>Id</u>. at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, (2009), quoting <u>Twombly</u>, 550 U.S. at 556. When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. <u>See</u> <u>Ruiz v. Bally Total Fitness Holding Corp.</u>, 496 F.3d 1, 5 (1st Cir. 2007). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." <u>Gagliardi v. Sullivan</u>, 513 F.3d 301, 305 (1st Cir. 2008). Applying this pleading standard to the facts alleged in the Complaint establishes that the Plaintiffs have failed to state a claim against the City of Newton.

## <u>ARGUMENT</u>

**I.     COUNT 4: 42 U.S.C. § 1983 – NEGLIGENT TRAINING AND SUPERVISION FAILS TO STATE A CLAIM BECAUSE NEGLIGENCE DOES NOT SUPPORT CONSTITUTIONAL CLAIMS AND THERE ARE NO ALLEGATIONS OF SIMILAR INCIDENTS TO SUPPORT <u>MONELL</u> LIABILITY.**

This count fails to state a claim because negligent training and supervision does not support a constitutional violation advanceable under 42 U.S.C. § 1983. <u>See</u> <u>e.g.</u>, <u>Daniels v.</u>

Williams, 474 U.S. 327, 328-31 (1986) (rejecting concept of a negligent act triggering a claim of a due process violation).

A municipality also may not be held vicariously liable under § 1983 for the acts of its employees. Doe v. Lincoln-Sudbury Reg'l Sch. Comm., 2021 WL 3847985, at *12–13 (D. Mass. Aug. 27, 2021), citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 692 (1978). Under Monell and its progeny, however, a municipality may be liable for its failure to train or supervise its employees when that failure "causes a constitutional violation or injury" and "amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." Doe v, 2021 WL 3847985, at *12–13, quoting DiRico v. City of Quincy, 404 F.3d 464, 468 (1st Cir. 2005); City of Canton v. Harris, 489 U.S. 378, 388 (1989). A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. Connick v. Thompson, 563 U.S. 51, 61 (2011).

To adequately plead a failure-to-train claim or failure to supervise claim, the complaint must allege, among other things, that "municipal decisionmakers either knew or should have known that training [or supervision] was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies." Gray v. Cummings, 917 F.3d 1, 14 (1st Cir. 2019). To demonstrate deliberate indifference, the complaint must allege a "pattern of similar constitutional violations by untrained employees." Id., quoting Connick v. Thompson, 563 U.S. 51, 62 (2011). Therefore, to assert failure-to-train or failure to supervise claims, the Complaint must allege that NPD's failures (1) caused the alleged violation of Conlon's Fourth Amendment rights and (2) amounted to deliberate indifference of the rights of those with whom the NPD officers would come in contact. See DiRico, 404 F.3d at 468.

Here, the Complaint fails to state a claim because the officers did not violate Conlon's constitution rights, as addressed in the individual defendants' motion to dismiss. Furthermore, the Complaint does not contain factual allegations to support that Newton policy makers acted with "deliberate indifference" in that respect. See Hayden v. Grayson, 134 F.3d 449, 456 (1st Cir. 1998) ("The liability criteria for 'failure to train' claims are exceptionally stringent ...."). The Complaint does not include factual (non-conclusory) allegations that indicate that any failure to train or supervise was a "deliberate or conscious choice" by policy makers. Id.

Critically, the Plaintiffs fail to allege facts to support a "pattern of *similar* constitutional violations by untrained employees." Gray, 917 F.3d at 14 (emphasis added). They also fail to allege that any of the individually sued police officers had any previous similar incidents or disciplinary history. Rather, the Complaint only alleges Conlon's single instance of a claimed constitutional violation regarding people with mental health issues. See Massachusetts ex rel. Powell v. Holmes, 546 F. Supp. 3d 58, 71 (D. Mass. 2021) (courts cannot infer the existence of such a policy or custom from an isolated instance of misconduct).

And even if Conlon's constitutional rights were violated, that does not sufficiently allege or represent a pattern of constitutional violations that would show deliberate indifference by Newton policy makers because the Complaint contains no allegations about any other past similar incidents, let alone that any Newton officials were aware of any past incidents. It makes no allegations that any officials failed to properly train officers to avoid such incidents, or that they failed to adequately supervise officers in carrying out their duties, or that they provided grossly inadequate discipline and remediation to officers. See Humphrey v. Comoletti, 2017 WL 1224539, at *9-10 (D. Mass. Mar. 31, 2017) (deliberate indifference cannot be inferred; it must be shown in the complaint).

Rather than establishing that policy makers were "deliberately indifferent," the Complaint alleges that the NPD employed a full-time social worker, Sarah Eknian, to respond to mental health situations. Complaint ¶¶ 35, 148. The Complaint also includes information that the Newton Police Department issues General Orders to ensure that all Department personnel comply with established policies, procedures, and regulations. The Use of Force policy governs appropriate standards for police officers using force and includes the use of less-than-lethal beanbag projectile weapon, among many other things. The policy of Special Operations establishes procedures for responding to high-risk emergencies, including suicide and emotionally disturbed/distraught barricaded persons. This involves partnering with NEMLEC's Regional Response Team and SWAT teams and negotiators. Complaint ¶ 42 (a-e).

The Complaint contains conclusory allegations about appropriate police practices for interacting with persons with disabilities. But these assertions are insufficient to support a failure-to-train claim because to survive a motion to dismiss is not enough for the Plaintiff to allege that the NPD's training regimen was faulty. The Plaintiffs must also allege facts to support that the City knew or had reason to believe that such a regimen had unconstitutional effects. The Plaintiffs have made no allegations of past violations sufficient to put the City on notice of such effects. Therefore, the Complaint does not allege facts to support an inference that City officials were deliberately indifferent to the risk of the alleged constitutional violation. Consequently, the Plaintiffs' claim regarding the NPD's training and supervision fails to state a claim. See Gray, 917 F.3d at 14.

II.     **COUNT 5: 42 U.S.C. § 1983 – UNCONSTITUTIONAL FAILURE TO PROVIDE MENTAL HEALTH IN VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS FAILS TO STATE A CLAIM BECAUSE CONLON WAS NOT INTENTIONALLY DEPRIVED OF MENTAL HEALTH TREATMENT AND THERE HAVE BEEN NO OTHER INCIDENTS TO SUPPORT MUNICIPALITY LIABILITY.**

This count fails to state a claim against the City because the Complaint does not allege facts to support an inference (1) that any of the individual officers acted to intentionally deprive Conlon of mental health treatment and (2) that any such violation was caused by a City policy.

A.     **Allegations in the Complaint do not establish that officers intentionally deprived Conlon of mental health treatment.**

The due process clause of the Fourteenth Amendment requires governmental authorities to provide medical care to persons who have been injured while being apprehended by the police. Barbosa v. Conlon, 962 F. Supp. 2d 316, 330–31 (D. Mass. 2013), citing Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990). "The boundaries of this duty have not been plotted exactly; however, it is clear that they extend at least as far as the protection that the Eighth Amendment gives to a convicted prisoner." Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 74 (1st Cir. 2016), quoting Gaudreault, 923 F.2d at 208. In order to succeed in pleading a Fifth or Eighth Amendment claim based on denied or inadequate medical care, a prisoner must allege facts to satisfy: (1) an objective prong that requires proof of a serious medical need,[2] and

---

[2] As to the objective component, a plaintiff must plead facts, which, if true, show "a serious medical need for which [the plaintiff] has received inadequate treatment." Kosilek, 774 F.3d at 85. For purposes of the Eighth Amendment, a medical need is "serious" if it "has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. at 82, quoting Gaudreault, 923 F.2d at 208. "A significant risk of future harm that prison administrators fail to mitigate may suffice under the objective prong." Id. at 85 (citations omitted). The objective prong "does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing." Id. at 82.

(2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need. See Spencer v City of Bos., 2015 WL 6870044, at *7 (D. Mass. Nov. 6, 2015), citing Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014).

Here, the Complaint fails to allege facts to satisfy the subjective component. This requires the Plaintiff to plead factual allegations supporting an inference of "deliberate indifference" by the officers. Kosilek, 774 F.3d at 83. Deliberate indifference refers to "a narrow band of conduct[.]" Id., quoting Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 162 (1st Cir. 2006). Demonstrating deliberate indifference requires allegations supporting a conclusion "that the absence or inadequacy of treatment is intentional" rather than simply inadvertent. Perry, 782 F.3d at 78. The obvious case of deliberate indifference would be a denial of needed medical treatment in order to punish the inmate. Kosilek, 774 F.3d at 83, citing Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993). Deliberate indifference may also reside in wanton decisions to deny or delay care where the action is recklessness, not in the tort law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable. Watson, 984 F.2d at 540. The Complaint does not allege facts to support an inference that any of the individual officers acted with deliberate indifference to intentionally to deprive Conlon of medical treatment, including for reasons to punish him. Rather, the Plaintiffs allege that Captain Dowling and Sergeant Chisholm acted on "an opening" after Conlon dropped the knife at his feet. They acted to get Conlon secured so that he did not hurt himself or others. As a result, the allegations fail to establish "deliberate indifference" by any of the officers.

### B.    Allegations in the Complaint do not establish any violation was caused by a City policy and there have been no similar incidents.

As addressed above, a municipality can only be held liable for alleged constitutional deprivations that arise from a governmental policy or practice. Smith v. City of Holyoke, 2020

WL 1514610, at *11 (D. Mass. Mar. 30, 2020). For such a claim, in addition to establishing a constitutional deprivation, a plaintiff must show that (1) the municipality had a custom, policy, or practice of failing to investigate, discipline, supervise, or train its officers; (2) this custom, policy, or practice was such that it demonstrated a "deliberate indifference" to the rights of those citizens with whom its officers came into contact; and (3) the custom, policy, or practice was the direct cause of the alleged constitutional violation. Smith, 2020 WL 1514610, at *11, citing DiRico v. City of Quincy, 404 F.3d 464, 468-69 (1st Cir. 2005); see also City of Canton v. Harris, 489 U.S. 378, 388-89 (1989); Monell, 436 U.S. at 690-92.

Here, the Complaint does not allege facts to support any of these elements. The Plaintiffs do not allege any similar incidents related to the intentional denial of mental health care. This vitiates their claim because the existence of a municipal policy cannot be inferred from an alleged isolated and single act of misconduct by city employees; to do so would amount to permitting precisely the theory of strict liability rejected in Monell. See Canton, 489 U.S. at 399–400, citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24, 831 (1985) (a single act by a police officer cannot by itself establish proof of a "policy" of inadequate training for municipal liability); see also Doe v. Town of Wayland, 179 F. Supp. 3d 155, 172 (D. Mass. 2016). Accordingly, this count fails to state a claim and should be dismissed.

## III.    COUNT 6: AMERICANS WITH DISABILITIES ACT (ADA) – FAILURE TO ACCOMMODATE CONLON'S DISABILITY UNDER THE ADA; COUNT 7: AMERICANS WITH DISABILITIES ACT (ADA) – FAILURE TO TRAIN; AND COUNT 8: REHABILITATION ACT FAIL TO STATE CLAIMS.

### A.    ADA and Rehabilitation Act claims are addressed together.

The analysis for Counts 6, 7 and 8 are combined because as a general matter, Title II of the ADA "is to be interpreted consistently with" section 504 of the Rehabilitation Act, which

prohibits disability discrimination by entities receiving federal financial assistance. Gray, 917 F.3d at 17 n.11, citing Theriault v. Flynn, 162 F.3d 46, 48 n.3 (1st Cir. 1998).

**B.      It is not decided whether or how the ADA applies to on-the-street police encounters.**

Whether or not the ADA applies at the point of seizures or on the scene police encounters are "murky waters" that the First Circuit has been "reluctant to plunge headlong into." Gray, 917 F.3d at 16. As the First Circuit has explained when previously addressing these issues, some background is helpful. Id. Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title I proscribes disability-related discrimination in employment, see Id. § 12112, and Title III proscribes disability-related discrimination in the provision of public accommodations (such as hotels, restaurants, and theaters), see Id. §§ 12182, 12184. These titles are not implicated by the present case. See Gray, 917 F.3d at 14-15.

Title II broadly provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Id. § 12132.

The Plaintiffs' ADA claim against the City is brought under this Title. To establish a violation of Title II, the Plaintiffs must allege facts to show: (1) that Conlon was a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of his disability. Gray, 917 F.3d at 14–15, citing Buchanan v. Maine, 469 F.3d 158, 170-71 (1st Cir.

2006).[3] The focal point of the inquiry is whether, during Conlon's encounter with the NPD officers, he was denied the benefits of the City's services, programs, or activities or was otherwise discriminated against by reason of his disability. Gray, 917 F.3d at 15, citing Buchanan, 469 F.3d at 170-71.

The Plaintiffs allege that the Defendants failed to provide reasonable accommodations for Conlon. This theory appears to hold that a violation may be found when police officers "properly investigated and arrested a person with a disability for a crime unrelated to that disability, [but] they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." Gray, 917 F.3d at 15. The Gray court identified three questions in this analysis: (1) Does Title II apply to ad hoc police encounters with members of the public during investigations and arrests, and if so, to what extent?; (2) Assuming that Title II applies to police encounters, may a public entity be held liable under Title II for a line employee's actions on a theory of respondeat superior?; and, (3) Is proof of a defendant's deliberate indifference (as opposed to discriminatory animus) sufficient to support a plaintiff's claim for damages under Title II? Id. at 16. The First Circuit, however, specifically declined to decide any of these questions. The court found it unnecessary when finding summary judgment for the municipality in a situation where an officer used a taser on a woman suffering from known mental health issues. Id. at 18.

---

[3] A "qualified individual with a disability" is an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. 42 U.S.C. § 12131(2). In turn, the term "public entity" includes "any State or local government" as well as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." Id. § 12131(1).

1.      **The ADA should not be applied to on-the-street police encounters until the scene is secure.**

While not decided, the better approach is that the ADA does not apply to ad hoc police encounters or seizures. As the First Circuit has explained, the circuits are split on this issue. Gray, 917 F.3d at 16. The Fifth Circuit has held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." Hainze v. Richards, 207 F.3d 795, 801 (5th Cir. 2000) ("[l]aw enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to identify, assess, and react to potentially life-threatening situations." To require them to factor in whether their actions are going to comply with the ADA in the presence of exigent circumstances and prior to securing the scene poses an unnecessary risk.) The Court should adopt this rule because it provides superior clarity and safety, does not require an officer to guess at a diagnosis or ADA compliance before securing a scene, and the reasonableness of force in the context of arrests should not be governed by 20/20 hindsight but rather by the factors established in Graham v Connor, 490 U.S. 386, 396 (1989).

Other circuits, however, have decided differently, holding that Title II applies without exception to ad hoc police encounters. See, e.g., Haberle v. Troxell, 885 F.3d 170, 180 (3d Cir. 2018) (concluding that "police officers may violate the ADA when making an arrest by failing to provide reasonable accommodations for a qualified arrestee's disability"); Bircoll v. Miami-Dade County, 480 F.3d 1072, 1085 (11th Cir. 2007) (explaining that "Title II prohibits discrimination by a public entity by reason of [plaintiff]'s disability" during investigations and arrests); see also Gohier v. Enright, 186 F.3d 1216, 1221 (10th Cir. 1999) (stating that "a broad rule categorically excluding arrests from the scope of Title II ... is not the law"). Under this approach, exigent

circumstances attendant to a police officer's decisions during an ad hoc encounter simply weigh in the balance when evaluating the reasonableness of a prospective ADA accommodation. See Haberle, 885 F.3d at 181 n.11; Bircoll, 480 F.3d at 1085-86.

Meanwhile, the Sixth Circuit did not decide whether Title II applies in the context of arrests because even if the plaintiff's failure-to-accommodate claim was cognizable, the officers in that case faced exigent circumstances while attempting to restrain and arrest the plaintiff. Roell v. Hamilton Cnty., Ohio/Hamilton Cnty. Bd. of Cnty. Commissioners, 870 F.3d 471, 489 (6th Cir. 2017). "[A]lmost immediately after the deputies arrived, Roell swiftly approached them brandishing a hose with a metal nozzle and a garden basket. The deputies, in other words, were required to make a series of quick, on-the-spot judgments in a continuously evolving environment." Id. The court concluded that the plaintiff's proposed accommodations – that the officers use verbal de-escalation techniques, gather information from witnesses, and call EMS services before engaging with her were "unreasonable … in light of the overriding public safety concerns." Id.

Here, under any standard of ADA analysis, Counts 6, 7 and 8 should be dismissed because based on the factual allegations in the Complaint, the individual police officers faced exigent circumstances throughout their encounter with Conlon. At an armed robbery call, police found Conlon with a knife. The officer drew his firearm and ordered Conlon to stop and drop the knife. Conlon fled into his apartment building while keeping the knife. He continued to refuse commands to drop the knife and instead used the knife to bang on his neighbor's door while calling out for her. Conlon would also intermittently waive the knife around, hold it to his throat, and threaten suicide. After about 20 minutes, an officer finally convinced him to drop the knife by his feet. But at that point the officers still did not have Conlon secure or control of this

precarious situation, which reasonable officers would continue to find threatening. Captain

Dowling changed tactics and ordered the use of the less-than-lethal to attempt to secure him.

When the less-than-lethal did not deploy, Conlon picked up the knife and charged at Sergeant

Chisholm forcing Officers Scaltreto and Benes to use deadly force. Because the allegations in the

Complaint establish exigent circumstances, the ADA and Rehabilitation counts should be

dismissed.

 Prior to Gray, the First Circuit expressed skepticism of whether Title II of the ADA

applies to a police officer's decision in the context of an arrest. It has explained that "[i]t is

questionable whether the ADA was intended to impose any requirements on police entering a

residence to take someone into protective or other custody beyond the reasonableness

requirement of the Fourth Amendment." Buchanan, 469 F.3d at 176 n.13. Indeed, the application

of the ADA to arrests is unnecessary and only serves to increase confusion and complexity for

law enforcement officers in difficult situations, especially where the objective reasonableness

requirement of the Fourth Amendment adequately protects people with disabilities in the course

seizures.

 It appears that, if anything, Title II is meant to apply at the entity level, rather than to

individual officers. In Buchanan, as to plaintiff Buchanan's arguments on training, this Court

ruled that "[w]hether obliged by Title II or not, the County had policies and did train officers on

the needs of the mentally ill public" and, further, that "[a]n argument that police training, which

was provided, was insufficient does not present a viable claim that Buchanan was "denied the

benefits of the services ... of a public entity" by reason of his mental illness, as required under 42

U.S.C. § 12132. Id. at 177. Here, too, the Plaintiffs' failure to train claim fails to state a claim. In

addition, based on the allegations in the Complaint, the deadly force was caused by Conlon charging at an officer while wielding a knife.

The text of the ADA indicates that Congress did not intend for Title II to apply to the decisions of individual police officers in the context of arrests. Title II prohibits discrimination in places of public accommodations and applies specifically to "services, programs, or activities of a public entity" and prohibits discrimination "by any such entity." 42 U.S.C. § 12132. "Public Entity" is defined as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government…" 42 U.S.C. § 12131. The language demonstrates that Title II was not intended to apply to the decisions of individual officers, but rather to policies of public entities. Furthermore, it stretches the common definitions of words to consider police seizures as "services, programs, or activities of a public entity" under the ADA.

A comparison of the language in Title I of the ADA, which was enacted at the same time, lends further support to the conclusion that Title II does not apply to an individual officer's arrest. Title I, which applies to employment law, indicates that it applies to the actions of individuals in stating that "no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge or employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. The term "covered entity" is defined as an "employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111. And "employer" in Title I is, in turn, defined as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such

person….." Id. Had Congress intended for Title II to apply to the actions of individual officers in the contest of seizures it could have used language like that in Title I and have included reference to "agents" of public entities. But Congress did not do so, and it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion of particular language in one section of a statute but omits it in another section of the same Act. Dean v. United States, 556 U.S. 568 (2009). Therefore, it appears that Congress did not intend for Title II to apply to the decisions of individual officers during the course of seizures under the Fourth Amendment.

> **2.      A public entity should not be vicariously liable for money damages under Title II of the ADA based on the conduct of a line employee.**

The First Circuit, in Gray, has explained that this question arises because, in Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1998), the Supreme Court held that a school district could not be held liable under Title IX of the Education Amendments of 1972 "unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [district]'s behalf has actual knowledge of discrimination." Id. at 290. Whether the rationale of Gebser should be extended to insulate public entities from liability under Title II of the ADA on a theory of respondeat superior is an open question. Compare, e.g., Duvall v. County of Kitsap, 260 F.3d 1124, 1141 (9th Cir. 2001) (stating that "public entity is liable for the vicarious acts of its employees" under Title II), with, e.g., Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 348-49 (11th Cir. 2012) (finding no respondeat superior liability under section 504 of Rehabilitation Act in light of Gebser).[4]

---

[4] When granting summary judgment for the municipality, the First Circuit assumed without deciding that a public entity could be held vicariously liable under Title II for a police officer's actions. But the court specifically noted that it did not decide the question. Gray v. Cummings, 917 F.3d at 17.

Although not resolved,[5] vicarious liability should not be available for two reasons. See Montgomery v. D.C., 2022 WL 1618741, at *14–15 (D.D.C. May 23, 2022). First, Gebser, 524 U.S. at 277, indicates that such a conclusion. In that case, the Supreme Court considered the availability of vicarious liability under Title IX of the Education Amendments of 1972. The Court rejected a broad theory of vicarious liability and instead held that "damages may not be recovered [for an employee's misconduct] unless an official ... who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the [employee's] misconduct." Id. The Court first noted that "the private right of action under Title IX is judicially implied"; consequently, the Court had "a measure of latitude to shape a sensible remedial scheme." Id. at 284. The Court reasoned that allowing for vicarious liability under Title IX would not be sensible in part because, at the time of Title IX's enactment, most civil rights laws did not permit recovery of money damages, meaning it was unlikely Congress would have implicitly authorized "unlimited recovery in damages against a funding recipient where the recipient is unaware of discrimination in its programs." Id. at 285–86. The Court also noted that Title IX "condition[ed] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." Id. at 286. The Court's "central concern," therefore, was ensuring the entity receiving federal funds would have notice of its liability. See Id. at 287. Title IX's express

---

[5] The question of whether vicarious liability is available under Title II and Section 504, remains unresolved. City & Cnty of S.F. v. Sheehan, 575 U.S. 600, 610 (2015). The Sixth Circuit concluded that "[v]icarious liability is not available for claims under Title II of the Americans with Disabilities Act." Jones v. City of Detroit, Michigan, 20 F.4th 1117, 1118 (6th Cir. 2021), cert. denied, 214 L. Ed. 2d 13, 143 S. Ct. 84 (2022). The Fifth Circuit has said that "a public entity may be held vicariously liable for the acts of its employees under either" Title II or Section 504. T.O. v. Fort Bend Indep. Sch. Dist., 2 F.4th 407, 416 (5th Cir. 2021), cert. denied, 213 L. Ed. 2d 1038, 142 S. Ct. 2811 (2022), reh'g denied, 213 L. Ed. 2d 1145 (2022).

remedial scheme is also "predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation." Id. at 290 (citation omitted). Based on this, the Court concluded "that the implied damages remedy should be fashioned along the same lines," Id., meaning a plaintiff seeking damages cannot rely on a broad theory of vicarious liability under Title IX.

Although Gebser's focus was on Title IX of the Education Amendments, its conclusion deserves weight in determining the availability of vicarious liability under Title II of the ADA and Section 504 of the Rehabilitation Act. Title II incorporates "[t]he remedies, procedures, and rights set forth in [the Rehabilitation Act,]" 42 U.S.C. § 12133, and the Rehabilitation Act incorporates "[t]he remedies, procedures, and rights set forth in [Title VI] of the Civil Rights Act of 1964," 29 U.S.C. § 794a(a)(1); see also Hooper v. City of St. Paul, 2019 WL 4015443, at *12 (D. Minn. Aug. 26, 2019) (noting the borrowing between statutes).

Therefore, "[t]he remedies available for violations of Title II of the ADA and § 505 of the Rehabilitation Act are 'coextensive' with those for Title VI [and the statutes] operate like one 'matryoshka doll' within another." Jones v. City of Detroit, Michigan, 20 F.4th 1117, 1119 (6th Cir. 2021), cert. denied, 214 L. Ed. 2d 13, 143 S. Ct. 84 (2022) (citations omitted). Title IX was also "modeled after Title VI of the Civil Rights Act of 1964," and the two statutes are considered "parallel." Gebser, 524 U.S. at 286; accord Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 258 (2009) ("[Congress] passed Title IX with the explicit understanding that it would be interpreted as Title VI was."). "For obvious reasons, then, courts have consistently relied on Title IX cases when applying Title VI (and vice versa), and on both Title IX and Title VI cases when

applying Title II of the ADA and the [Rehabilitation Act] (and vice versa)." <u>Hooper</u>, 2019 WL

4015443 at *12 & n.20 (collecting cases).[6]

The second reason that Title II's language suggests that the statute does not allow for

vicarious liability is that Title II prohibits public entities from discriminating against qualified

individuals on the basis of their disabilities, 42 U.S.C. § 12132, and the statute defines a "public

entity" to include "any State or local government"; "any department agency, special purpose

district, or other instrumentality of a State or States or local government"; and "the National

Railroad Passenger Corporation, and any commuter authority," 42 U.S.C. § 12131(1). Title I of

the ADA, on the other hand, prohibits covered entities from discriminating against qualified

individuals on the basis of their disabilities, 42 U.S.C. § 12112(a), and defines "covered entity"

to include "employer[s]," 42 U.S.C. § 12111(2). "Employer" is then defined to include "a person

engaged in an industry affecting commerce [who meets certain restrictions] ... and any agent of

such person." 42 U.S.C. § 12111(5)(A). The D.C. Circuit has noted that the "obvious purpose" of

an analogous provision in Title VII of the Civil Rights Act of 1964 "was to incorporate

respondeat superior liability into the statute." <u>Gary v. Long</u>, 59 F.3d 1391, 1399 (D.C. Cir.

---

[6] Not all of the considerations on which the Court relied in <u>Gebser</u> to interpret Title IX apply equally to Title VI, Title II, or Section 504. <u>Montgomery</u>, 2022 WL 1618741, at *15. For instance, while private causes of action are implied under all four statutes, see <u>Barnes v. Gorman</u>, 536 U.S. 181, 184–85 (2002) (Title II and Section 504); <u>Cannon v. Univ. of Chi.</u>, 441 U.S. 677, 703 (1979) (Title IX and Title VI), Title II differs from the rest in that it was not enacted pursuant to the Spending Clause, <u>Jones</u>, 20 F.4th at 1122. But the Supreme Court has previously rejected the theory that the ADA should be interpreted differently from the Rehabilitation Act and Title VI and Title IX because of this distinction. <u>Barnes</u>, 536 U.S. at 189 n.3; <u>Ingram v. Kubik</u>, 30 F.4th 1241, 1259 (11th Cir.), <u>cert. dismissed</u>, —— U.S. ——, 142 S. Ct. 2855, 213 L.Ed.2d 1082 (2022). Therefore, <u>Gebser</u> and the statutory borrowing between Title IX, Title VI, Title II, and Section 504 compel the conclusion that vicarious liability is not available under Title II or Section 504. <u>E.g.</u>, <u>Kubik</u>, 30 F.4th at 1258; <u>Jones</u>, 20 F.4th at 1122; <u>Arthur</u>, 2020 WL 1821111, at *11.

1995), quoting <u>Miller v. Maxwell's Int'l, Inc.</u>, 991 F.2d 583, 587 (9th Cir. 1993); accord <u>EEOC v.</u>

<u>AIC Sec. Investigations, Ltd.</u>, 55 F.3d 1276, 1281 (7th Cir. 1995). Therefore, Congress has

created vicarious liability in a civil rights statute but pointedly decided not to do so in Title II,

suggesting that Congress did not intend to make vicarious liability available under that title.

<u>Montgomery</u>, 2022 WL 1618741, at *15. In sum, because of both <u>Gebser</u> and Title II's text, Title

II and Section 504 do not provide for vicarious liability. <u>Id</u>.

> **3.    The standard should be intentional discrimination or malice to recover money damages. But in any event, the Plaintiffs' Complaint does not allege facts to satisfy the lower standard of deliberate indifference by the officers or city officials (regarding a failure to train) and therefore the ADA claim should be dismissed.**

Under either standard, the Complaint fails to state an ADA claim. Because a plaintiff

must show "intentional discrimination" on the part of the public entity to be eligible for damages

on a Title II claim, <u>Nieves-Márquez v. Puerto Rico</u>, 353 F.3d 108, 126 (1st Cir. 2003),

intentional discrimination should be the standard. But some uncertainty exists as to whether

"deliberate indifference" is the functional equivalent of "intentional discrimination." <u>Gray</u>, 917

F.3d 17. Several circuits have held that a showing of deliberate indifference may suffice to prove

this element. <u>See</u>, <u>e.g.</u>, <u>Haberle</u>, 885 F.3d at 181; <u>Duvall v. Cnty. of Kitsap</u>, 260 F.3d 1124, 1138

(9th Cir. 2001), <u>as amended on denial of reh'g</u> (Oct. 11, 2001). The question, however, is an open

one in the First Circuit, and the court has stated, "under Title II, non-economic damages are only

available when there is evidence 'of economic harm or animus toward the disabled.'" <u>Carmona-</u>

<u>Rivera v. Puerto Rico</u>, 464 F.3d 14, 17 (1st Cir. 2006), quoting <u>Nieves-Márquez</u>, 353 F.3d at

126-27. Animus requires a higher showing of intentional discrimination than deliberate

indifference. <u>S.H. ex. rel. Durrell v. Lower Merion Sch. Dist.</u>, 729 F.3d 248, 263 (3d Cir. 2013).

Applying either standard to the factual allegations in the Complaint demonstrates that that ADA claim should be dismissed.

Here, the Complaint does not contain facts to support that the individual officers or City officials had animus toward Conlon based on his disability. There are also no facts plead to support that any police officer or city official acted with deliberate indifference to the risk of an ADA violation. That is, the individuals knew there was a reasonable accommodation which they were required to provide. The Complaint alleges that it was clear Conlon had a disability but contains no facts that the individual officers had any particularized knowledge about the nature and degree of his disability. There are insufficient allegations that the officers knew that Conlon suffered from major depression, bipolar disorder, and schizoaffective disorder. Without such particularized knowledge, they had no way of gauging what specific accommodation, if any, might have been reasonable under the circumstances. In addition, the Plaintiffs have made allegations about national police standards but have not alleged that the officers knew about these standards or that they knew an ADA-protected right was likely to be jeopardized by their actions. Nor were the officers' actions in this case so plainly antithetic to the ADA as to obviate the knowledge requirement. The Plaintiffs make allegations about national standards, but "falling below national standards does not make the risk of an ADA violation so obvious as to eliminate the knowledge requirement. Gray, 917 F.3d at 18-19. Based on Nieves-Márquez v. Puerto Rico the standard should be intentional discrimination or malice to recover money damages, but in any event the Plaintiffs' Complaint does not allege facts to show either standard and the ADA claim should be dismissed.

**C.** **Conlon did not suffer greater injuries due to his disability and officers accommodated Conlon based on the factual allegations in the Complaint.**

The Plaintiffs' failure to accommodate theory under the ADA fails to state a claim because the Complaint does not contain allegations to support that during Conlon's seizure, the officers failed to reasonably accommodate his disability and that caused Conlon to suffer greater injury or indignity in that process than other arrestees." Gray, 917 F.3d at 15; Adle v. Maine Police Dep't, 279 F. Supp. 3d 337, 362-63 (D. Me. 2017), citing Gorman v. Bartch, 152 F.3d 907, 912–13 (8th Cir. 1998) (reversing dismissal of ADA suit alleging police had discriminated against arrestee by transporting him to police station in vehicle unequipped to safely accommodate wheelchairs).

Here, the allegations in the Complaint do not support that Conlon suffered greater injury during his seizure than other arrestees, who do not suffer from disabilities. In addition, the officers accommodated Conlon by giving him space and speaking with him for 20 minutes and ultimately convincing him to drop the knife. The officers then reasonably changed tactics in an attempt to secure Conlon so that he could not hurt himself or others. When Conlon charged with the knife, the officers were forced to use of deadly force.

The case of Gohier v. Enright is instructive. The Tenth Circuit affirmed dismissal of an ADA claim where a tense encounter ensued during which the officer concluded that the individual was mentally ill. Gohier, 186 F.3d at 1221. The individual aggressively approached and lunged at the officer, and the officer fatally shot him. The Tenth Circuit held: "Officer Enright did not use force on Mr. Lucero because he misconceived the lawful effects of his disability as criminal activity, inasmuch as Lucero's assaultive conduct was not lawful. Neither did Enright fail to accommodate Lucero's disability while arresting him for "some crime unrelated to his disability." This threatening conduct warranted the officer's use of force. Id.

Like in <u>Gohier</u>, the Complaint fails to state a claim because the officers did not misperceive the lawful effects of Conlon's disability as criminal activity, but rather Conlon's dangerous conduct of fleeing from police, wielding a knife, refusing orders, and charging at police with a knife was not lawful. Furthermore, it would be impossible for the officers to know if Conlon's criminal conduct was as a result of or related to mental health issues or something else such as the effects of drugs.

Most critically, under any frame of analysis, the ADA claim should be dismissed because the NPD officers faced exigent circumstances. <u>Adle</u>, 279 F. Supp. At 364–66 (regardless of whether there is a per se rule that the ADA does not apply in exigent circumstances or whether exigency is one factor among many to determine whether a requested accommodation is reasonable, the threshold question is whether exigent circumstances existed). The NPD officers faced dangerous and exigent circumstances from the time they arrived on scene until they used deadly force to stop Conlon from charging with a knife. <u>Waller ex rel. Est. of Hunt v. Danville, VA</u>, 556 F.3d 171, 175 (4th Cir. 2009) (exigency is not confined to split-second circumstances - although the officers did not face an immediate crisis, the situation was nonetheless unstable).

Accordingly, the Complaint fails to state a claim because the factual allegations in the Complaint establish a situation faced by the officers that involved exigent circumstances and a threat to human safety. <u>See</u> <u>Waller</u>, 556 F.3d at 175 ("Accommodations that might be expected when time is of no matter become unreasonable to expect when time is of the essence.").

<u>**CONCLUSION**</u>

For the forgoing reasons, the City of Newton respectfully requests that this Honorable Court dismiss the Plaintiffs' Complaint for failure to state a claim under Rule 12(b)(6).

Respectfully submitted,
The Defendant,
City of Newton,
By its attorney,


*/s/ Thomas R. Donohue*
Thomas R. Donohue, BBO# 643483
BRODY, HARDOON, PERKINS & KESTEN, LLP
699 Boylston Street, 12th Floor
Boston, MA 02116
(617) 880-7100
tdonohue@bhpklaw.com

DATED: May 5, 2023

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.


*/s/ Thomas R. Donohue*
Thomas R. Donohue, BBO# 643483

DATED: May 5, 2023