# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

———————————————————————— )
**ROBERT CONLON AND BETSY CONLON,** )
**as personal representatives of the Estate of** )
**Michael Conlon,** )
 )
      **Plaintiffs,** )
 )      **Civil Action No.**
  **v.** )      **23-10026-FDS**
 )
**CITY OF NEWTON, et al.,** )
 )
      **Defendants.** )
———————————————————————— )

# MEMORANDUM AND ORDER ON
# DEFENDANTS' MOTIONS TO DISMISS

**SAYLOR, C.J.**

This is a civil rights action alleging the use of excessive force by police officers arising out of a tragic encounter with a mentally-ill man that resulted in his death.

In January 2021, a Newton police officer responded to the scene of a suspected armed robbery. He encountered Michael Conlon holding a kitchen knife, who fled into a nearby apartment building. After Conlon was cornered on a stairway landing, he threatened to harm himself if the officer came any closer. More officers responded to the scene.

Conlon suffered from significant mental-health issues, including schizoaffective disorder. Although it is unclear whether the officers at the scene knew the details of his disorders, they certainly knew he had a serious mental-health problem, and that he was in a delusional state.

After a brief standoff, officers convinced Conlon to drop the knife. One officer then attempted to use a "less-than-lethal" shotgun—a shotgun that fires a beanbag—to disable Conlon and effect his arrest. But the shotgun misfired, producing only a clicking noise. At that point,

Conlon retrieved the knife and advanced on the officers.  Officers then fatally shot him.

Conlon's parents, plaintiffs Robert and Betsy Conlon, sued the City of Newton and five individual police officers.  The complaint alleges federal claims under 42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA"), along with several related state-law claims. Defendants have moved to dismiss the complaint for failing to state a claim upon which relief can be granted.

The critical issue in this case is not whether, with the benefit of hindsight, the police response was appropriate in all respects.  Police officers can, and often do, make serious mistakes, particularly when making split-second decisions in emergency situations.  Rather, the issues here are whether the use of force was so unreasonable as to violate the Fourth Amendment, and, if so, whether a reasonable police officer would have understood that use of force to amount to a constitutional violation.  If the answer to either of those questions is no, the officers are entitled to qualified immunity.

That inquiry is somewhat complicated by the fact that Conlon was suffering from mental-health issues and appeared to be delusional at the time of the incident.  Such a person, under most circumstances, deserves special solicitude and care.  At the same time, a person with severe mental-health disorders—particularly one who is in a delusional state and brandishing a weapon—can be substantially more dangerous to others than an ordinary person.  Those complicating factors must be considered when assessing the objective reasonableness of the police response.

In any event, under the circumstances presented here, neither the City of Newton nor its officers violated the law during the incident with Conlon.  Accordingly, and for the reasons set forth below, the motions to dismiss will be granted.

I.      **Background**

Except as otherwise noted, the following facts are set forth as alleged in the first amended complaint.

A.      **Factual Background**

1.      **The Parties**

Michael Conlon was a 28-year-old man who resided in Newton, Massachusetts.  (Compl. ¶¶ 28, 35).  He suffered from mental illness from an early age, and was eventually diagnosed with major depression, bipolar disorder, and schizoaffective disorder.  (*Id.* ¶¶ 29-39).  Symptoms of his illness included delusions, suicidal ideation, suicide attempts, and irrational fears.  (*Id.* ¶ 33).  Some of those symptoms led him to fear police.  (*Id.* ¶ 34).

Robert and Betsy Conlon were Michael's parents and are the appointed representatives of his estate.  (*Id.* ¶ 21).  They reside in Medfield, Massachusetts.  (*Id.* ¶ 36).

The City of Newton (the "City") is a Massachusetts municipality.  (*Id.* ¶ 2).  The Newton Police Department ("NPD") is an agency of the City.

Dennis Dowling, Christopher Marzilli, Glenn Chisholm, Richard Benes, and Francis Scaltreto are NPD employees.  (*Id.* ¶¶ 23-27).  Dowling and Marzilli are both captains; Chisholm is a sergeant; and Benes and Scaltreto are patrol officers.  (*Id.*).

2.      **The Incident**

On January 5, 2021, NPD officer Zachary Raymond was dispatched to an armed robbery at a candy store at 16 Lincoln Street in Newton.  (*Id.* ¶ 50).  When he arrived, Raymond saw Michael Conlon standing outside the store holding a "small kitchen knife."  (*Id.* ¶ 52).[1] Raymond drew his weapon and ordered Conlon to drop the knife.  (*Id.*).  Instead, Conlon turned

---

[1] The precise size and shape of the knife is not identified in the complaint.

and entered an apartment building at 18 Lincoln Street.[2]  Raymond followed.  (*Id.* ¶¶ 53-54).[3]

Conlon climbed several flights of stairs to the third floor of the apartment building. (*Id.* ¶ 54).  Raymond continued to pursue him and again ordered him to drop the knife. (*Id.* ¶ 55).  On the third floor, Conlon stopped and held the knife to his own throat, threatening to harm himself if Raymond approached.  (*Id.*).  Raymond then retreated to the second-floor landing.  (*Id.* ¶ 56).

As Raymond waited, several other NPD officers arrived, including Captains Dowling and Marzilli.  Dowling and Marzilli determined that Conlon was experiencing a mental-health crisis. (*Id.* ¶ 59).  Those officers were allegedly "aware" of Conlon's "mental health challenges," but are not alleged to have any particularized knowledge about his condition at the time of the incident.  (*Id.* ¶ 38).  The NPD officers, along with several members of the Massachusetts State Police, positioned themselves to surround Conlon, some below him on the second-floor landing, and others at the other end of the hallway on the third floor.  (*Id.* ¶ 62).

Conlon continued to speak to the officers, saying that he believed that he was in a "simulation" and questioning whether the officers were real, while visibly spitting and drooling. (*Id.* ¶¶ 63-65).  Several officers feigned belief in his statements but continued to ask him to drop the knife.  (*Id.* ¶ 64).

Outside, Sarah Eknaian, an NPD social worker, had arrived.  Eknaian's general role with the NPD was to respond alongside police officers to calls involving apparent mental-health disorders or substance abuse.  (*Id.* ¶ 68).  The NPD requested assistance from the Northeastern Massachusetts Law Enforcement Council ("NEMLEC") tactical team.  (*Id.* ¶ 74).

---

[2] According to the complaint, Conlon lived in the building.  (Compl. ¶ 35).

[3] Although Raymond presumably called for backup at some point, that fact is not alleged in the complaint.

As the scene grew increasingly crowded, either Dowling or Marzilli ordered Sergeant Chisholm to retrieve a beanbag-projectile shotgun.  (*Id.* ¶ 77).  A beanbag is a "less-than-lethal" projectile "intended to incapacitate the subject and prevent further aggressive actions" when "a violent or potentially violent subject cannot be subdued in any other less-than-lethal manner without the threat of death or serious bodily injury to the officer or other persons."  (*Id.* ¶ 48).  Dowling and Marzilli formulated a plan to use the beanbag shotgun in the event that there was a chance to end the standoff before the NEMLEC team arrived.  (*Id.* ¶ 80).  If the opportunity arose, they intended to use the beanbag shotgun to effect Conlon's arrest.  (*Id.*).  If necessary, two state troopers were instructed to use Tasers to incapacitate Conlon.  (*Id.*).  Dowling further told Officer Benes that he was the "lethal option" in case the Tasers were ineffective.  (*Id.* ¶ 81).

Back inside, Officer Scaltreto was talking with Conlon, who was still holding the knife and had picked up a fire extinguisher.  (*Id.* ¶ 90).  After continuing to engage, Scaltreto eventually persuaded him to drop both items.  (*Id.* ¶¶ 93-94).  Once Conlon put down the knife, Scaltreto told the officers behind him that there was "an opening."  (*Id.* ¶ 95).  Hearing that information, Dowling gave the order to use the beanbag shotgun.  (*Id.* ¶ 100).  Chisholm raised the shotgun, aimed it at Conlon's collarbone, and pulled the trigger.  (*Id.* ¶ 103).  The shotgun misfired, producing only a loud clicking noise.  (*Id.* ¶ 107).

The complaint alleges that the clicking sound "startled [Conlon] and caused him to pick up the kitchen knife" and begin to approach Chisholm.  (*Id.* ¶¶ 107, 109).[4]  A state trooper tried

---

[4] Plaintiffs suggest that "[w]hether [Conlon] picked up the knife and/or advanced at officers is a disputed fact."  (Pl. Opp'n, ECF No. 50 at 8 n.15).  To support that position, they exclusively rely on the use of "allegedly" used in two paragraphs.  (Compl. ¶¶ 14, 108).  Plaintiffs assert that the purported "allegations" were raised by police officers during an inquest investigating Conlon's death.  (Pl. Opp'n, ECF No. 50 at 1 n.1).

The complaint itself, however, plainly states (without qualification) that Conlon "pick[ed] up the kitchen knife" and "approached" Chisholm.  (Compl. ¶¶ 107, 109).  It does not mention the inquest proceeding, any "allegations" raised by the officers there, or even explicitly identify a disputed issue of fact.

to use a Taser to subdue Conlon, but "almost simultaneously" Benes and Scaltreto fired their own sidearms, killing him.  (*Id.* ¶¶ 109, 111).

### B.      Procedural Background

Plaintiffs originally filed this suit on January 5, 2023, and subsequently amended the complaint on November 15, 2023.

The amended complaint asserts five claims against NPD officers Francis Scaltreto, Richard Benes, Glenn Chisholm, Dennis Dowling, and Christopher Marzilli:  excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983 (Count 1); violations of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, §§ 11H-11I (Counts 7 and 8); and wrongful death under Mass. Gen. Laws ch. 229, § 2 (Count 9).

It asserts four claims against the City:  failure to train its officers in violation of the Fourteenth Amendment under 42 U.S.C. § 1983 (Count 2); and failure to accommodate a disability and to train its officers in violation of the ADA, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794(a) (Counts 4-6).

The complaint also asserts a claim against all defendants for a failure to provide mental-health treatment in violation of the Fourteenth Amendment under 42 U.S.C. § 1983 (Count 3).

Finally, it asserts a claim for common-law assault against Chisholm (Count 10).

Defendants have moved to dismiss all claims under Fed. R. Civ. P. 12(b)(6) for failure to state to claim upon which relief can be granted.

## II.     Standard of Review

On a motion to dismiss made pursuant to Rule 12(b)(6), the court "must assume the truth

---

The Court cannot disregard the plain language of the complaint (which, of course, was drafted by counsel for plaintiffs), nor rely on later representations of counsel to incorporate additional facts.  While the Court will disregard the factual allegations qualified by the complaint itself, it will not ignore the unequivocally pleaded factual allegations.

of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III.   Analysis

### A.   Individual Officers

#### 1.   Qualified Immunity Generally

The doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity is determined according to a two-part test.  *See Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009); *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009).  The relevant inquiries are (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct.  *Maldonado*, 568 F.3d at 268-69.

The question is not whether some right has been clearly established at a highly abstract level, but "whether, under the circumstances that confronted the official, 'a reasonable official would understand that what he is doing violated that right.'"  *Berthiaume v. Caron*, 142 F.3d 12, 15 (1st Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  In other words, the question is "whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." *Burke v. Town of Walpole*, 405 F.3d 66, 77 (1st Cir. 2005) (quoting *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004)).  The qualified-immunity doctrine "leaves 'ample room for mistaken judgments.'"  *Berthiaume*, 142 F.3d at 15 (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

To show that an official's conduct violated a clearly established right, the plaintiff bears the burden "to identify controlling authority or a consensus of persuasive authority sufficient to put the officers on notice that their conduct violated the law."  *Estate of Rahim v. Doe*, 51 F.4th 402, 412 (1st Cir. 2022); *see also Rivera-Corraliza v. Morales*, 794 F.3d 208, 214-15 (1st Cir. 2015) (noting that a plaintiff's failure to identify such authority dooms their claims).  While a prior case need not be identical to clearly establish a right, "[p]recedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful."  *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 18 (2015)).  Still, qualified immunity is an affirmative defense, and the burden is on defendants to show they are entitled to its protection.  *DiMarco-Zappa v. Cabanillas*, 238 F.3d 25, 35 (1st Cir. 2001).

### 2.      Excessive Force

Count 1 asserts a claim under 42 U.S.C. § 1983 against the individual defendants for "excessive use of force" in violation of the Fourth Amendment right "to be free from unreasonable seizures."  (Compl. at 21).  The complaint alleges four purportedly unreasonable

actions:  (1)  Conlon was surrounded in "tight quarters"; (2) Chisholm pointed the beanbag shotgun at Conlon; (3) Chisholm "attempt[ed]" to fire the beanbag shotgun; and (4) Benes and Scaltreto used deadly force.  (*Id.* ¶ 134).[5]  The complaint extends those claims to the other officers based on a breach of their "duty to intervene" to prevent a constitutional deprivation.  (*Id.* ¶ 149).  The individual defendants contend that they are protected by qualified immunity.

Claims under § 1983 have two essential elements:  "[1] the defendant must have acted under color of state law, and [2] his or her conduct must have deprived the plaintiff of rights secured by the Constitution or by federal law."  *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008).  It is undisputed here that the individual defendants were acting under the color of state law during their encounter with Conlon; the issue is whether their actions deprived Conlon of his constitutional rights.  *See West v. Atkins*, 487 U.S. 42, 50 (1988).

"To establish a Fourth Amendment violation based on excessive force, a plaintiff must show that the defendant officer employed force that was unreasonable under the circumstances."  *Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  In other words, a plaintiff must show (1) that there was a "seizure" within the meaning of the Fourth Amendment, and that (2) the use of force during the seizure was unreasonable.  *Graham*, 490 U.S. at 395.  Here, there is no dispute that Conlon was "seized," at least by the time that officers had isolated him on the third-floor landing of his apartment building.  (Compl. ¶ 62).  The critical question, therefore, is whether the officers' subsequent use of deadly force was unreasonable.

---

[5] The First Circuit has suggested that courts should analyze each use of force in an excessive force separately using a "segmented approach," particularly when "circumstances relevant to the reasonableness inquiry changed between one use of force and another."  *Lachance v. Town of Charlton*, 990 F.3d 14, 25 (1st Cir. 2021); *see also County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017) ("[T]he objective reasonableness analysis must be conducted separately for each . . . seizure that is alleged to be unconstitutional.").

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.  The objective reasonableness of the force used is determined with a balancing test that considers, among other things, the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*  The right to make an arrest carries with it the right to use some physical force. *Id.*  Only *excessive* force is actionable; "not every push or shove rises to the level of a constitutional violation." *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 205 (1st Cir. 1990).

The officer's subjective intent or motivation is not relevant to the reasonableness inquiry. *Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002) (citing *Alexis v. McDonald's Rests. of Massachusetts*, 67 F.3d 341, 352 (1st Cir. 1995)).  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

### a.  Surrounding Conlon

The complaint first asserts that the officers acted unreasonably by surrounding Conlon in "close quarters" while attempting to effect his arrest.[6]

That conduct alone cannot establish an excessive-force claim.  The First Circuit recently

---

[6] Neither party has addressed that allegation as a basis for the excessive-force claim.

rejected a similar claim that officers "created" a more dangerous situation by "closing in" on arrestee's position. *Bannon v. Godin*, 99 F.4th 63, 80 (1st Cir. 2024).  Here, the complaint is clear that officers were called to the scene of an armed robbery and that an officer saw Conlon armed with a knife.  (Compl. ¶¶ 50-52).  When Conlon saw the officer, he fled.  (*Id.* ¶ 53).  At that point, at a minimum, there was probable cause for Conlon's arrest.  Once more officers arrived, Conlon continued to hold the knife and picked up a fire extinguisher, and did not immediately submit to the officers' commands.  (*Id.* ¶¶ 63, 64, 82, 93).  Although the complaint appears to characterize some of its pleaded facts as disputed, it suggests that Conlon may have also been threatening to harm himself if officers approached.  (*Id.* ¶ 55).  The officers did not rush at him—or indeed touch him at all—and continued to delay and negotiate.  (*Id.* ¶¶ 90-94).  While the officers' positioning may not have been a model of tactical proficiency, any such shortcoming was not objectively unreasonable under the circumstances presented, and the complaint does not allege a plausible constitutional violation on that basis.

### b.  <u>Pointing the Shotgun</u>

The complaint next asserts that the use of the beanbag shotgun—in particular, the pointing of the shotgun at Conlon—was unreasonable under the circumstances, and thus constituted excessive force.

It is true that in certain circumstances the pointing of a weapon can amount to unreasonably excessive force.  *See Penate v. Sullivan*, 73 F.4th 10, 21 (1st Cir. 2023) ("Pointing a weapon at a nonthreatening, compliant individual . . . can constitute excessive force."); *Stamps v. Town of Framingham*, 813 F.3d 27, 39-40 (1st Cir. 2016) ("pointing [a] loaded assault rifle at the head of a prone, non-resistant, innocent person who present[ed] no danger, with the safety off and a finger on the trigger, constituted excessive force in violation of that person's Fourth Amendment rights"); *Mlodzinski v. Lewis*, 648 F.3d 24, 38-39 (1st Cir. 2011) (finding police

used excessive force after holding a compliant, handcuffed teenager and a "nearly naked" non-resisting woman at gunpoint for several minutes).

However, "if the pointing of weapons is both reasonably necessary to secure the officers' safety and sufficiently short in duration, there will likely be no Fourth Amendment problem." *Penate*, 73 F.4th at 21; *see also Los Angeles Cnty. v. Rettele*, 550 U.S. 609, 614 (2007) (no constitutional violation when officers entered a bedroom with guns drawn, ordered the residents out of bed, and then held them naked at gunpoint for several minutes before realizing they were in the wrong house). In assessing whether pointing a weapon constituted unreasonable force, a court may consider how long the subject is held at gunpoint, the extent to which he complied with police officers' commands, and whether he might have had access to weapons.

Here, the complaint alleges that the beanbag shotgun, if fired at short range, could be considered a lethal weapon. (Compl. ¶ 104). At the same time, it also is clear that it was only briefly pointed at Conlon shortly before he was fatally shot, and that he was within reach of both a knife and a fire extinguisher. (*Id.* ¶¶ 91, 107). Although it suggests that Conlon was at least partly compliant with officers' commands because he dropped his weapons, the continuing standoff indicates that his compliance was limited at best. Those circumstances are not the kind of unreasonable or excessive conditions that could support a plausible constitutional violation.

In any event, even if the pointing of the less-than-lethal shotgun could have amounted to a constitutional violation, Chisholm is protected by qualified immunity. Plaintiffs have presented no controlling authority or "consensus of persuasive authority" clearly establishing that briefly pointing a less-than-lethal weapon at any arrestee, let alone one with access to weapons and in the midst of a mental-health emergency, would violate the Constitution. *Rahim*, 51 F.4th at 412; *Gray v. Cummings*, 917 F.3d 1, 10 (1st Cir. 2019). At least as of 2008, the First

Circuit was also unable to identify any such authority. *See Estate of Bennett v. Wainwright*, 548 F.3d 155, 174 (1st Cir. 2008) ("A reasonable officer could have believed that pointing a firearm at a mentally unstable individual with access to weapons did not amount to excessive force under the circumstances.").

Because the complaint fails to allege a plausible constitutional violation, and because plaintiffs cannot meet their burden to show the purported right at issue was clearly established at the time of the incident, Chisholm is entitled to qualified immunity on that basis.

**c.**     <u>**Attempted Use of the Shotgun**</u>

The complaint also asserts that Chisholm's "attempted use" of the less-than-lethal beanbag shotgun was unreasonable. It states that the shotgun "did not fire correctly" and instead made "a loud clicking sound," and it does not allege that any beanbag projectiles were ever actually fired at Conlon. (Compl. ¶ 107). Plaintiffs urge the Court to assess the attempted use of the shotgun according to what force might have been used had it functioned correctly.

Whether Chisholm's conduct could be considered an unreasonable use of force invites a number of difficult questions. To begin, it is not at all clear that Chisholm's attempt to use the beanbag shotgun—plainly intentional though it was—should be assessed as if he had successfully employed the weapon. It is axiomatic in cases alleging excessive force that an officer's subjective intent is irrelevant to a court's objective analysis of whether any such force was reasonable. *Bastien*, 279 F.3d at 14; *Graham*, 490 U.S. at 397. In other words, just as it would be impermissible to immunize an officer based on his subjective understanding that his use of force was reasonable, it would be equally wrong to punish an officer for an objectively reasonable use of force, even if his subjective intent was to cause impermissible harm.

Moreover, focusing on the objective use of force avoids the impossible task of weighing the reasonableness of a hypothetical—rather than actual—use of force. Were a court to

13

undertake that task, there would be no means to weigh the "nature and quality" of a use of force that never actually occurred against any relevant government interest. *See Graham*, 490 U.S. at 397. Instead, courts would be forced to imagine the most extreme possible outcomes from a given scenario, and then weigh whether that hypothetical use of force was reasonable under the circumstances—as plaintiffs urge here. Adopting such a view would expand the scope of officers' liability beyond what actually happened to what might have happened. There is no basis in law for the Court to entertain that expansion, and thus the complaint does not plausibly state a constitutional violation based on the attempted use of the less-than-lethal shotgun.

Even assuming that the complaint alleges an underlying constitutional violation, however, plaintiffs have not met their burden to show that Chisholm's use of a less-than-lethal beanbag shotgun violated any clearly established right. Plaintiffs point to three cases from other circuits to support their position, but none are analogous to the circumstances presented here.[7]

In *Deorle v. Rutherford*, an officer used a less-than-lethal shotgun to shoot an "emotionally disturbed" arrestee in the face, without warning, even though he was unarmed, "had not attacked or even touched anyone," had obeyed instructions by various officers over a period of almost 40 minutes, and was not suspected of having committed any crime. 272 F.3d 1272, 1275 (9th Cir. 2001). The shot destroyed the arrestee's left eye and lodged pieces of lead in his skull. *Id.* at 1279. The Ninth Circuit determined that although using the beanbag shotgun did not amount to "deadly force," it was "serious" and only justifiable in light of a strong governmental interest. *Id.* at 1280.

The circumstances here are materially different to those in *Deorle*. Unlike the arrestee

---

[7] Plaintiffs also point to a case from the District of Maine, in which the court held that the use of a less-than-lethal beanbag shotgun could constitute lethal force under Maine law. *Norton v. City of S. Portland*, 831 F. Supp. 2d 340, 347 (D. Me. 2011). The circumstances of that case are clearly inapplicable here, and, in any event, that holding does not clearly establish any constitutional right. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

there, officers had probable cause to believe that Conlon had just attempted to commit an armed robbery with a knife. (Compl. ¶ 50). He was holding a knife (and possibly a fire extinguisher) for most of the confrontation. (*Id.* ¶¶ 93-94). Indeed, only his relinquishing of the knife provided the "opening" for Chisholm to attempt to employ the less-than-lethal shotgun. (*Id.* ¶¶ 94-95). Moreover, the fact that he had resisted putting the knife or fire extinguisher down for approximately 20 minutes signaled some unwillingness to comply with officers' commands. (*Id.* ¶ 93). The circumstances in *Deorle*, involving a substantially more compliant and unarmed arrestee, would not have put Chisholm on notice that using a beanbag shotgun would have violated any constitutional right.[8]

In *Glenn v. Washington Cnty.*, the circumstances were closer to those presented here. 673 F.3d 864, 867 (9th Cir. 2011). There, police officers responded to a home where an intoxicated teenager armed with a pocketknife had threatened to kill himself. *Id.* When officers arrived, the teenager was standing with his parents and two friends but had not threatened them or anyone else. *Id.* at 868. After a brief standoff, police officers used a beanbag shotgun to attempt to subdue the teenager, striking him six times. *Id.* at 873-74. The teenager began to run toward his home, and the police officers fatally shot him. *Id.* at 874. The Ninth Circuit expressly did not determine that the officers' actions were objectively unreasonable, deciding instead that there remained a question of fact as to whether the teenager posed a threat to anyone at the time the beanbag rounds were deployed. *Id.* at 870. The court acknowledged that a "jury could . . . reach the conclusion that the officers' use of force was reasonable." *Id.* at 878.[9]

---

[8] In any event, the First Circuit has also previously considered the weight of *Deorle* in clearly establishing a constitutional right and noted that the case "it is neither controlling authority nor a 'consensus' of persuasive authority," and that "it has been superseded by the many later Supreme Court and circuit precedents . . . ." *Rahim*, 51 F.4th at 413 (citation omitted).

[9] The Ninth Circuit proceeded to reverse the district court's grant of summary judgment based on its now-abrogated "provocation rule," in which an officer could be held liable for an otherwise reasonable use of force if the

Even assuming that some of the factual circumstances in *Glenn* were similar to those presented here, that case (at most) establishes that those circumstances *might* lead to a constitutional violation—a conclusion that would not have provided notice to Chisholm that his attempted use of the shotgun violated the Constitution.

The Ninth Circuit also decided another case involving the use of a beanbag shotgun fewer than three months before the incident here.  In *Cortesluna v. Leon*, police responded to an emergency call reporting a serious incident of domestic violence.  979 F.3d 645, 649 (9th Cir. 2020), *rev'd in part on other grounds*, 595 U.S. 1 (2021).  After observing the suspect for some time, he was ordered out of the house, and he generally complied with officers' commands.  *Id.* at 650.  When he was eleven feet away from one officer, he moved his hands toward a knife he was carrying in his front pocket, at which point an officer shot him twice with beanbag rounds. *Id.*  The Ninth Circuit decided that the officer's use of the less-than-lethal shotgun was objectively reasonable under the circumstances, noting the seriousness of the crime, the threat posed by the suspect given his easy access to a knife, and his unwillingness to fully comply with officers' commands.  *Id.* at 653.  In light of the Ninth Circuit's decisions in *Glenn* and *Cortesluna*, it is doubtful that Chisholm's actions here would have violated a clearly established right in the Ninth Circuit, let alone in the First Circuit.

Finally, plaintiffs point to *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005). In that case, police were called to the home of an emotionally disturbed man who was threatening to harm himself.  *Id.* at 1154.  When they arrived, the man was sitting on his kitchen floor with a telephone cord wrapped around his neck and holding a knife to his chest.  *Id.*  The

---

need for that force was "provoked" by an independent Fourth Amendment violation.  *See Glenn*, 673 F.3d at 879-80. The Supreme Court has squarely rejected that rule.  *See Mendez*, 581 U.S. at 423.

man refused to comply with their commands.  *Id.*  Shortly thereafter, an officer shot the man in

the head with a "Sage Launcher," firing a baton at 240 feet per second from six feet away.  *Id.*

The impact of the baton fractured the man's skull, causing permanent brain injuries.  *Id.*  The

Eleventh Circuit concluded that the officer violated the man's rights "[b]ecause he was not

committing a crime, resisting arrest, or posing an immediate threat to the officers at the time he

was shot in the head," assuming the officer intended to aim there.  *Id.* at 1157-58.

The facts here are clearly distinguishable from *Mercado* in multiple respects, including

the nature of the confrontation with the police officers, the specific types of weapons in question,

and the circumstances of their use.  No reasonable officer in Chisholm's position would have

concluded that *Mercado* put him on notice that attempting to use a beanbag shotgun in the

circumstances here would violate any clearly established right.

Accordingly, because the facts alleged in the complaint do not support a claim that

Chisholm committed any constitutional violation, and because plaintiffs have not met their

burden to show that any such right was clearly established as of January 5, 2021, Chisholm is

entitled to qualified immunity for his attempted use of the beanbag shotgun.[10]

### d.   <u>Deadly Force</u>

Finally, the complaint asserts that the firing of the fatal shots by Officers Benes and

Scaltreto was objectively unreasonable, and thus constituted excessive force.  As discussed, it

alleges that after the shotgun misfired, the noise "startled [Conlon] and caused him to pick up the

kitchen knife he had just dropped . . . ."  (Compl. ¶ 107).  Conlon then "approached" Chisholm.

---

[10] Moreover, because the attempted use of the beanbag shotgun did not constitute a violation of the Fourth
Amendment, it cannot serve as a predicate constitutional violation for which plaintiffs could recover based on a
theory that it proximately caused the later use of deadly force.  *See Mendez*, 581 U.S. at 431.

(*Id.* ¶¶ 109, 111).  As he "approached" with the knife, a State Trooper fired his Taser, but "almost simultaneously," Benes and Scaltreto shot and killed him.  (*Id.* ¶¶ 109, 111).

There are myriad factual questions surrounding the critical moments before the shooting, many of which are not alleged in the complaint.  It does not, for example, explain how rapidly Conlon approached, or whether he held the knife as if to strike Chisholm, or whether the officers took any other intervening actions.  That lack of specificity poses a challenge for both parties in the context of qualified immunity.  On the one hand, without clearly articulated facts it is difficult to evaluate the objective circumstances that faced officers at the scene.  On the other, a lack of specificity can thwart plaintiffs' efforts to show that a specific right was clearly established at the time of the incident.  Even so, the Supreme Court has directed courts to resolve immunity questions at the earliest possible stage of litigation.  *See Pearson*, 555 U.S. at 232; *Rahim*, 51 F.4th at 411.  Accordingly, the Court will proceed to consider whether, as pleaded, the factual circumstances presented in the complaint support a viable claim.

The intentional use of deadly force during a seizure is unconstitutional unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury.  *Tennessee v. Garner*, 471 U.S. 1, 3 (1985); *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 23 (1st Cir. 2005).  To guide that analysis, the First Circuit has identified eight relevant factors for evaluating the reasonableness of an officer's use of force:

> (1)  "whether a reasonable officer on the scene could believe that the suspect posed an immediate threat to police officers or civilians;"
>
> (2)  "whether a warning was given before the use of force and whether the suspect complied with this command;"
>
> (3)  "whether the suspect was armed—with a gun, knife, or otherwise—at the time of the encounter;"
>
> (4)  "the speed with which officers had to respond to unfolding events, both in terms of the overall confrontation and the decision to employ force;"

(5) "whether the suspect was advancing on the officers or otherwise escalating the situation;"

(6) "the suspect's physical proximity to the officers at the time of the use of force;"

(7) "whether multiple officers simultaneously reached the conclusion that a use of force was required;" and

(8) "the nature of the underlying crime."

*Rahim*, 51 F.4th at 414-15; *see also Conlogue v. Hamilton*, 906 F.3d 150, 156 (1st Cir. 2018);

*Kisela*, 584 U.S. at 103; *City of San Francisco v. Sheehan*, 575 U.S. 600, 612 (2015).

Here, whether the officers' use of deadly force was objectively reasonable is a close question. At the moment of the shooting, an officer at the scene could reasonably believe that Conlon posed a threat to Chisholm—he had escalated the situation by rearming himself with a knife in response to an attempt to subdue him and was approaching Chisholm from twelve feet away. (Compl. ¶ 106). Both Scaltreto and Benes concluded that deadly force was required "almost simultaneously." (*Id.* ¶ 109). While the specific circumstances of the suspected armed robbery are unclear, an officer at the scene would at least have had reasonable cause to believe that Conlon had threatened someone with the knife. (*Id.* ¶ 50). The complaint does not indicate whether a warning was given before the fatal shots were fired, or how much time elapsed between the attempted use of the less-than-lethal shotgun and the shooting itself.

Overall, the factual circumstances would suggest that the officers' use of deadly force was likely objectively reasonable. However, considering the limited record, the Court will not make a conclusive determination as to that issue. Instead, it will proceed to consider whether, at the time of the incident, the state of the law was sufficiently established to put a reasonable officer on notice that using deadly force under those circumstances would amount to a constitutional violation.

It was not.  Plaintiffs have failed to meet their burden to show any authority—controlling

or otherwise—that would support finding a constitutional violation when officers use deadly

force in response to an advancing suspect in a mental-health emergency who is armed with a

knife.  Indeed, several controlling authorities appear to establish the reverse.

In *Kisela*, for example, officers responded to a 911 report of a woman with a knife acting

erratically.  584 U.S. at 101.  When officers arrived, they observed the woman armed with a

large knife approaching another person.  *Id.*  After the woman disregarded the officers'

commands to drop the knife, but continued to approach the person, officers shot her.  *Id.* at 102.

Although the Supreme Court did not conclusively determine whether the officers had committed

a constitutional violation, it held that the officer who used lethal force was entitled to qualified

immunity because he had not violated any clearly established law.  *Id.* at 106.

The First Circuit also recently faced an analogous situation in *Estate of Rahim*, 51 F.4th

at 404.  In that case, police sought to apprehend a terrorism suspect in a parking lot.  *Id.* at 405.

After a confrontation, the suspect began to advance on the officers with a knife, despite their

commands to stop.  *Id.* at 406.  Once the officers could retreat no further, they shot the suspect

when he came within 25 feet of them.  *Id.*  The First Circuit determined both that the officers had

committed no constitutional violation and, in any event, that the state of the law did not clearly

establish that they had committed any violation.  *Id.* at 412-17.

Although the factual allegations contained in the complaint here are obviously not

identical to either of those cases, their holdings at least illustrate that the existing precedent at the

time of the shooting in January 2021 did not put the constitutional question facing Benes and

Scaltreto "beyond debate."  *Id.* at 413 (quoting *Kisela*, 584 U.S. at 104).  Accordingly, they are

entitled to qualified immunity for their use of force.

e.      **Totality of the Force**

Finally, the First Circuit has recently noted that "after segmenting the uses of force and assessing each as reasonable, a court [can] thereafter look at the totality of the uses of force and determine [whether] there was a constitutional violation." *Lachance*, 990 F.3d at 25 n.10; *see also Penate*, 73 F.4th at 22 n.9.

Even considering the officers' entire course of conduct, they are still entitled to qualified immunity, both because the totality of the circumstances do not establish that they committed a constitutional violation, and because the law has not clearly established that similar circumstances would amount to such a violation.

In sum, because the allegations in the complaint fail to state a viable claim of excessive force under the Fourth Amendment, Count 1 will be dismissed.[11]

3.      **Substantive Due Process**

Count 3 of the complaint alleges that defendants violated Conlon's due-process rights under the Fourteenth Amendment by failing to provide him with mental-health treatment during the confrontation with police.

The First Circuit has recognized that "the due process clause of the Fourteenth Amendment . . . require[s] the responsible governmental authorities to provide medical care to persons who have been injured while being apprehended by the police." *Gaudreault*, 923 F.2d at 208 (citing *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)).  Arrestees generally have the same due-process right to medical care as that provided to convicted prisoners by the Eighth Amendment.  *Id.*; *see also Ruiz–Rosa v. Rullan*, 485 F.3d 150, 155 (1st Cir. 2007).  The Eighth Amendment standard involves "(1) an objective prong that requires proof of a serious

---

[11] Because there is no viable constitutional claim, there is also no secondary liability for the other officers for failing to intervene or to adequately supervise.  *See Wilson v. Town of Mendon*, 294 F.3d 1, 6-7 (1st Cir. 2002).

medical need, and (2) a subjective prong that mandates a showing of [officials'] deliberate indifference to that need." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (en banc).

Even assuming the Eighth Amendment standard applies in these circumstances, the complaint fails to allege any "deliberate indifference" by the arresting officers. While the complaint asserts that the officers exhibited such indifference by failing to use an available social worker or wait for the NEMLEC team to arrive, those decisions do not rise to the level of "wanton disregard" to Conlon's needs "akin to criminal recklessness." *Kosilek*, 774 F.3d at 83. Instead, the complaint asserts that multiple officers recognized that he was suffering from a mental-health episode, attempted to speak and negotiate with him, and feigned agreement with his delusions. (Compl. ¶¶ 62-67). They did not ignore his obvious distress. While they may have failed to use every available resource to assist him—and while it is also true that their decisions to use force ultimately led to his tragic death—that is not the same as "deliberate indifference" amounting to a constitutional violation.

In any event, plaintiffs have provided no authority (and the Court has found none) that would support finding a constitutional violation for failing to provide mental-health treatment to an arrestee before he is in custody, never mind an arrestee who poses a danger to others as well as himself. In the absence of any such clearly established right, the officers are entitled to qualified immunity. Accordingly, Count 3 as to the individual defendants will be dismissed.

### 4.    The MCRA

Counts 7 and 8 allege that the individual defendants, using "threats, intimidation, and coercion," intentionally and unlawfully used excessive deadly force against Conlon, and "thereby interfered with [his] right to life secured by Article XII of the Massachusetts Civil Rights [A]ct . . . ." (Compl. ¶ 215).

The MCRA provides a right of action to any person whose exercise or enjoyment of

rights secured by the federal or state constitution or laws has been interfered with by "threats, intimidation or coercion."  Mass. Gen. Laws ch. 12, § 11I.  "[T]he MCRA contemplates a two-part sequence: [liability attaches when] (1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that he has the constitutional right to do."  *Goddard v. Kelley*, 629 F. Supp. 2d 115, 128 (D. Mass. 2009).

The Supreme Judicial Court has held that "[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the [MCRA]." *Longval v. Comm'r of Corr.*, 404 Mass. 325, 333 (1989).  In other words, "threats, intimidation, or coercion" must be separately present in addition to the violation of rights.  *See Sarvis v. Boston Safe Deposit & Tr. Co.*, 47 Mass. App. Ct. 86, 93 (1999) (stating that *Longval* "affirmed the requirement under the MCRA that proof of 'threats, intimidation, or coercion' be in addition to the interference with the exercise or enjoyment of secured rights").  Allegations of excessive force, without more, have consistently been held not to constitute violations of the MCRA.  *See, e.g.*, *Farrah ex rel. Est. of Santana v. Gondella*, 725 F. Supp. 2d 238, 248 (D. Mass. 2010); *Gallagher v. Commonwealth*, 2002 WL 924243, at *3 (D. Mass. March 11, 2002).

Plaintiffs here conflate the two requirements of the MCRA.  Even if the individual officers' use of force amounted to a constitutional violation, that force was not used to cause Conlon to give up some other right; the force itself was the alleged constitutional violation. Without any facts suggesting the individual officers used threats, intimidation, or coercion distinct from the alleged use of excessive force, the complaint cannot support a viable claim under the MCRA.  Accordingly, Counts 7 and 8 will be dismissed.

### 5.      <u>Wrongful Death Act</u>

Count 9 alleges wrongful death under Mass. Gen. Laws ch. 229, § 2.  The complaint asserts that the officers "decisions leading to [Conlon's shooting] were intentional, willful,

23

wanton and/or reckless."  (Compl. ¶ 223).

Mass. Gen. Laws ch. 229, § 2 provides that a "person who (1) by his negligence causes the death of a person, or (2) by willful, wanton or reckless act causes the death of a person under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted, . . . shall be liable in damages."  "To prevail on a wrongful death claim, pursuant to Mass. Gen. Laws ch. 229, § 2, a plaintiff must prove negligence, or willful or reckless conduct, on the part of the defendant, that caused the death of a person."  *Gianocostas v. Interface Grp.-Mass., Inc.*, 450 Mass. 715, 727 n.13 (2008).  The Massachusetts Tort Claims Act "will bar a wrongful death claim against an individual defendant that proceeds on a negligence or recklessness theory, but not one that is based on willful or intentional conduct."  *Geigel v. Boston Police Dep't*, 2024 WL 68387, at *5 (D. Mass. Jan. 5, 2024); Mass. Gen. Laws ch. 258, § 2.  For an officer to be individually liable under the statute, therefore, he must have willfully and intentionally caused the death of another.  But "as a matter of Massachusetts law, if the officers' use of force was reasonable for Fourth Amendment purposes, [his] . . . wrongful death claims also fail."  *Bannon*, 99 F.4th at 77.

Here, because the complaint fails to plausibly allege that any of the individual defendants used excessive force violating the Fourth Amendment, it likewise fails to state a viable claim for wrongful death.  Accordingly, Count 9 will be dismissed.

### 6.      Common-Law Assault

The complaint asserts a claim against Sergeant Glenn Chisholm for common-law assault based on his "attempted use" of the less-than-lethal shotgun.

Massachusetts law allows for assault claims against police officers for their conduct during an arrest.  *Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010).  "However, Massachusetts law also allows an officer to use reasonable force in conducting a lawful arrest," and therefore

"reasonable force is a valid defense to assault and battery." *Id.* Where, as here, the complaint alleges both a § 1983 excessive-force claim and a state-law claim for assault, the reasonableness of the force used with respect to the § 1983 claim controls the assault analysis. *Id.* Qualified immunity for a § 1983 claim, however, will not necessarily foreclose liability for common-law tort claims. *Lachance*, 990 F.3d at 31.

Here, because the Court has determined that the complaint's allegations do not support a viable excessive force claim against Chisholm for his attempted use of the less-than-lethal shotgun, the same conduct also cannot sustain a viable state-law assault claim. Accordingly, Count 10 will be dismissed.

**B.** **City of Newton**

Again, the amended complaint asserts four claims against the City: constitutional claims under 42 U.S.C. § 1983 (Counts 2 and 3); and statutory claims under the ADA, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794(a) (Counts 4 through 6).

**1.** **Constitutional Claims**

**a.** **Failure to Train and Supervise**

The complaint asserts that the City violated Conlon's Fourteenth Amendment right to due process through § 1983 by failing to train and supervise its officers in the use of force, particularly in relation to people suffering from a mental illness.

A municipality may not be held vicariously liable under § 1983 for the acts of its employees. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). But a municipality may be directly liable for its failure to train or supervise its employees when that failure "causes a constitutional violation or injury" and "amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *DiRico v. City of Quincy*, 404 F.3d 464, 468 (1st Cir. 2005) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

To assert a failure-to-train claim, the complaint must plausibly allege, among other things, that "municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies." *Gray*, 917 F.3d at 14 (quoting *Haley v. City of Boston*, 657 F.3d 39, 52 (1st Cir. 2011)). Typically, demonstrating such deliberate indifference requires alleging a "pattern of similar constitutional violations by untrained employees." *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). The bar for such claims is a high one. *See Hayden v. Grayson*, 134 F.3d 449, 456 (1st Cir. 1998) ("The liability criteria for 'failure to train' claims are exceptionally stringent . . . .").

Here, even assuming the existence of a constitutional violation, the complaint does not contain any factual allegations concerning either the substance of the City's training program or any purported deficiencies in that program. It also fails to allege a "pattern of similar constitutional violations by untrained employees" that could have put the City on notice of any deficiency of its training program. *Gray*, 917 F.3d at 14; *see also Canton*, 489 U.S. at 390-91 (explaining that shortcomings in a single officer's training may result from negligent administration of "an otherwise sound program").

Under the circumstances, it cannot be reasonably inferred that the City was "deliberately indifferent" to the training of its police officers. *See Geigel*, 2024 WL 68387, at *2 (dismissing a § 1983 failure-to-train claim because the complaint neither identified a deficiency in the police training program at issue, nor a pattern of constitutional violations from which to plausibly infer deliberate indifference); *Barker v. City of Boston*, 795 F. Supp. 2d 117, 122-24 (D. Mass. 2011) (finding no deliberate indifference by a city after police shot a person with a mental illness when the plaintiff identified only two prior similar incidents over 19 years); *Osman v. Dwan*, 2021

WL 11505292, at *10-11 (D. Mass. July 30, 2021) (concluding that an allegation of a single incident of racial profiling by police was insufficient to state a § 1983 failure-to-train claim).

Accordingly, because the complaint does not plausibly allege that the City was deliberately indifferent to the training or supervision of its police officers, Count 2 will be dismissed.

### b.  Substantive Due Process

Because the complaint fails to plausibly allege a constitutional violation under the Fourteenth Amendment against the individual officers, and because those officers are protected by qualified immunity, Count 3 as to the City will also be dismissed.  *See Wilson*, 294 F.3d at 6; *Joyce v. Town of Tewksbury*, 112 F.3d 19, 23 (1st Cir. 1997).

### 2.  ADA Claims

The complaint further asserts claims against the City under Title II of the ADA and the Rehabilitation Act.  It states that the City violated those statutes by failing to accommodate Conlon's disability during the conduct of the arrest, and by "failing to train its employees to make reasonable accommodations to serve persons with mental health disabilities."  (Compl. ¶¶ 193-213).  Defendants respond that neither statute should apply in these circumstances, that vicarious liability should not be available, and that the complaint's factual allegations cannot support a claim because Conlon did not suffer greater injuries due to his disability.

### a.  Threshold Issues

In general, to state a plausible ADA claim, the complaint must allege that Conlon (1) was a "qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of [his] disability."  *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000).

For present purposes, there is no dispute that Conlon was a "qualified individual" and that the City is a "public entity" under the ADA.  The question thus is whether the City discriminated against Conlon during his arrest by reason of his disability.

The complaint's allegations raise at least three unsettled questions over the application of Title II of the ADA to police arrests, all of which are subject to competing answers from various courts.  *Gray*, 917 F.3d at 16-18.  Those questions are (1) whether Title II can apply in "*ad hoc*" police encounters such as the one presented here; (2) whether a public entity may be held liable under it on a theory of *respondeat superior*; and (3) whether a showing of "deliberate indifference" is the functional equivalent of "intentional discrimination" sufficient to establish liability under the ADA.  *Id.* at 16-17.  The First Circuit has previously identified all three of those questions and explicitly left them unresolved.  *Id.*  The City urges the Court to answer all three of those questions in the negative.

At this stage of the proceedings, and given the limited record, the Court will follow the First Circuit's lead and assume, without deciding, that the answer to those questions is in the affirmative.  *Id.* at 17.  Nonetheless, the ADA claim fails for other reasons.

### b.     Failure to Accommodate

Count 4 asserts that the City is liable under Title II of the ADA for its officers' failures to accommodate Conlon's disability during his arrest.

The First Circuit has identified two contexts in which a police officer may violate the ADA in effecting an arrest:  either by (1) wrongly arresting a person because they misperceived the effects of their disability as criminal activity, or (2) by failing to reasonably accommodate a person's disability during an arrest, thereby causing the person to suffer more harm in the process than other arrestees.  *Id.* at 15.  Only the latter theory is relevant here.  To state a viable claim under that theory, the complaint must allege, at a minimum, that (1) the officers knew that

Conlon had a disability that required them to act differently, and (2) they failed to change their conduct in light of that knowledge. *Id.* at 18.[12]

The complaint here fails at the first step. The knowledge element requires that a plaintiff show that defendants "knew that there was a reasonable accommodation [that they] were required to provide." *Id.* Such a showing requires at least some "particularized knowledge about the nature or degree of [the] disability," with which an officer might be able to "gaug[e] what specific accommodation, if any, might have been reasonable under the circumstances." *Id.*

In *Gray*, for example, although the arresting officer was generally aware that an arrestee had been involuntarily committed, he did not know the "nature or degree" of her mental condition—bipolar disorder—and thus could not know what accommodation might have been reasonable to provide. *Id.* at 6, 18; *see also Lambert v. Town of Merrimack*, 2019 WL 4805992, at *2-3 (D.N.H. Sept. 30, 2019) (finding that officers who shot a person suffering from a bipolar episode who threatened them with a knife lacked sufficient particularized knowledge about the decedent's disability to know what accommodation might have been reasonable and necessary).

Here, the complaint alleges in general terms that several NPD officers, including the individual defendants, and Sarah Eknaian (the NPD social worker) "were aware of [Conlon's] mental health challenges," and "had previous contact with [him]." (Compl. ¶¶ 38-39). It also suggests that the officers learned more about Conlon's condition by interacting with him during this encounter.

---

[12] The City also alludes to a separate line of cases discussing the requirements for stating a plausible ADA claim based on inadequate medical care. *See Geigel*, 2024 WL 68387, at *3 (citing *Messere v. Clark*, 2015 WL 5609959, at *12 (D. Mass. Sept. 22, 2015)). The allegations here are distinguishable in that the complaint asserts that the purported ADA violation at issue was a failure to accommodate Conlon's disability during his arrest, rather than a failure to provide specific medical treatment.

Those broad allegations are not enough.  As in *Gray*, even if the officers were on general notice that Conlon had a mental-health condition and observed him in a state of crisis, the complaint fails to allege that they had "particularized knowledge" as to the "nature or degree" of Conlon's condition that would have allowed them to gauge what accommodations might have been necessary and reasonable under the circumstances.  Without any such showing, the complaint fails to state a viable claim for failing to accommodate Conlon's disability under the ADA.  Accordingly, Count 4 will be dismissed.

### c.      Failure to Train

Count 5 next asserts that the City is directly liable under Title II of the ADA for failing to train its officers "to make reasonable accommodations in responding to a mental health emergency."  (Compl. ¶ 206).

The First Circuit has declined to definitively determine whether Title II of the ADA imposes a duty on a municipality to "draft policies and train officers on the needs of the mentally ill public."  *Buchanan v. Maine*, 469 F.3d 158, 177 (1st Cir. 2006).  It has been clear, however, that if training was provided, an allegation that such training was insufficient "does not present a viable claim that [an individual] was 'denied the benefits of the services . . . of a public entity' by reason of his mental illness, as required under [the ADA]."  *Id.*; *see also Adle v. Maine Police Dep't*, 279 F. Supp. 3d 337, 366 (D. Me. 2017).

Here, the complaint appears to allege, in conclusory terms, that the City's training program was "deficient," or "inadequate," or otherwise not "effective."  (Compl. ¶¶ 119-23).  Even crediting those allegations—as the Court must at this stage—they do not establish a complete lack of training that could support a claim in this context.  Accordingly, Count 5 will be dismissed.

### d.     The Rehabilitation Act

Finally, Count 6 asserts a claim under the Rehabilitation Act, 29 U.S.C. § 794(a), which

prohibits disability discrimination by entities receiving federal funds.  The applicable tests and

available remedies under that statute are coextensive with those under Title II of the ADA.

*Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 11 n.1 (1st Cir. 2004) ("The same

standards . . . apply to claims under the ADA and under the Rehabilitation Act."); *see also Gray*,

917 F.3d at 17 n.11.  Because both ADA claims fail here, so too does the claim under the

Rehabilitation Act.  Accordingly, Count 6 will be dismissed.

### IV.     Conclusion

For the foregoing reasons, defendants' motions to dismiss are GRANTED.  The Clerk is

directed to enter a separate order of dismissal.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  June 21, 2024                    Chief Judge, United States District Court